McKINNON v. McKINNON et **al.**

(Circuit Court of Appeals, Eighth Circuit. May 29, 1893.)

No. 97.

1. PARTNERSHIP—CONSTRUCTION OF ARTICLES—TESTAMENTARY DISPOSITION.

An uncle and nephew entered into articles of partnership for the practice of medicine, by which it was agreed that, "in the event of the death of the senior member of the firm, all his property, personal and otherwise, which he held in partnership at the time of his death, should go to the junior partner." *Held,* that this was not a testamentary disposition of the property, and hence it was capable of enforcement in equity, although not executed with the formalities required in a will. 46 Fed. Rep. 713, reversed.

2. SAME—CONSIDERATION.

A sufficient consideration for this provision is to be found in the mutual promises of the parties to become partners, and to conduct the business under the terms of the agreement, which furnish the consideration for the whole agreement. 46 Fed. Rep. 713, reversed.

3. SAME—PARTNERSHIP REALTY—EVIDENCE.

Land was purchased during the existence of the partnership, and with its funds, but title was taken in the name of the senior partner. Part of it was used for the firm's office, and on the rest stock taken in payment of fees due the firm was pastured. All expenses incident to the care of the property were paid by the firm, and the senior partner never charged the firm rent for its use. The junior testified that it was partnership property, and there was evidence of declarations by the senior to the same effect. *Held,* that it was partnership property, within the terms of the agreement, and passed to the junior on the death of the senior. 46 Fed. Rep. 713, reversed.

4. SAME.

Residence property owned by the senior before the partnership was formed was used for office purposes by the firm, and was afterwards rented. The firm received the rents, and improvements were made with the funds of the firm. There was direct testimony by the junior, and evidence of declarations by the senior, that this was agreed to be partnership property. *Held,* that its character as such was established, and the junior was entitled to it on the death of the senior. 46 Fed. Rep. 713, reversed.

5. PAROL EVIDENCE—STATUTE OF FRAUDS—PARTNERSHIP.

Where the existence of a partnership is established by an instrument in writing, the surviving partner is at liberty to prove by extrinsic evidence or by parol that certain lands held by the deceased partner were in fact the property of the firm, and cases of this description are not within the statute of frauds.

Appeal from the Circuit Court of the United States for the Western District of Missouri.

In Equity. This was a suit by John A. McKinnon against David H. McKinnon, Isabella McDonald, and John McDonald. The court below dismissed the bill. 46 Fed. Rep. 713. Complainant appeals. Reversed.

Statement by THAYER, District Judge:

This was a bill which was filed by the appellant in the circuit court for the western district of Missouri to restrain the appellees from prosecuting a certain ejectment suit, and to specifically enforce a covenant contained in a copartnership agreement that was entered into by the appellant and Malcolm McKinnon on the 1st of January, 1884. The partnership articles in which the covenant is contained are as follows, the provision which the appellant seeks to enforce being indicated by italics:

"We, the undersigned, Malcolm McKinnon and John A. McKinnon, of the town of Maysville, De Kalb Co., Mo., do, this first day of January, 1884, agree to enter into partnership for the purpose of practicing the arts of medicine and surgery in the town of Maysville and vicinity, from the first day of January, 1884, until the first day of January 1890, inclusive. We hereby agree to share the profits accruing from the practice of our profession equally, and to bear equally all expenses and losses incident to the same. We also agree to do all we reasonably can to advance the interests of the firm until the term of partnership expires, at which time we will, if mutually agreed, or at the request of any one of the firm, take account of stock and all profits in money or in any other property of which we are in possession, and, after deducting therefrom all expenses of the firm, and allowing for the difference in stock furnished at the commencement of the partnership, equally divide all profits which we will consider due to ourselves, our heirs or executors. And the junior member of the firm (J. A. McKinnon) agrees to relinquish all claims at the end of the term of partnership, or at any time after dissolution of the same, to the further practice of his profession in the town of Maysville and vicinity, unless it is mutually agreed upon to further continue in the partnership, or unless it is the wish of the senior member of the firm (M. McKinnon) that the junior member of the firm (J. A. McKinnon) should continue the practice of his profession unconnected with him, in which case the said J. A. McKinnon shall have full privilege to conduct the practice of his profession without any conditions in the town of Maysville and vicinity. *And it is further agreed upon that, should the senior member of the firm die or become incapable of practicing his profession, that the right to continue in the business should devolve on the junior member, (J. A. McKinnon,) and, in the event of the death of the senior member of the firm, that all his property, personal and otherwise, which he held in partnership at the time of his death, should go to the junior partner, J. A. McKinnon, provided the senior member leaves no family of his own to which it might recur.* And it is also agreed upon that, should the junior partner (J. A. McKinnon) die before the termination of the partnership, that his share of the partnership property be administered upon according to his expressed wishes, or, in the absence of that, according to the wishes of the senior member, (M. McKinnon,) providing J. A. McKinnon leaves no family of his own to inherit his property. To the faithful performance of the foregoing conditions in our articles of partnership, we, each of us, pledge ourselves, as witness our signatures, this first day of January, 1884.

"M. McKinnon, Senior Member.
"J. A. McKinnon."

The circumstances which preceded and gave rise to the controversy are as follows: Malcolm McKinnon, who signed the foregoing articles, was a physician, who had resided and practiced his profession at Maysville, De Kalb county, Mo., for some years prior to his death. At the time of his death, which occurred in May, 1886, he was about 45 years of age, and had never been married. He left surviving him one sister and three brothers, who resided, respectively, on Prince Edward island, in Scotland, in Massachusetts, and in New Jersey. He had been separated from those who were of kin to him for about 20 years before his decease. In the month of November, 1881, the appellant came from Lowell, Mass., to Maysville, Mo., and shortly thereafter became associated with Dr. Malcolm McKinnon, who was his uncle, in the practice of medicine and surgery. The relation of partnership, which appears to have been definitely formed as early as January 1, 1882, continued without interruption or difficulties of any sort until the death of the uncle, in the year 1886. During that period most of the hard work incident to the practice is said to have been done by the nephew. The nephew claims, and there is no evidence to the contrary, that he abandoned a position which he held as physician in the Lowell Dispensary, and came to Missouri, at the urgent solicitation of his uncle, who represented to him "that he was overcrowded with work, and that, if he would come, he would make him his partner, and make it an object for him to come." The partnership articles above set forth were drawn by Dr. Malcolm McKinnon with his own hand, and were executed by himself and by his nephew, at the instance of the former, on the day they bear date; but the partnership relation

had existed for two years previously, under an oral agreement, which, as it is claimed by the appellant, was substantially the same as that expressed by the written articles. When the partnership was formed, in the fall of 1881, or January, 1882, the elder Dr. McKinnon owned a small house and lot in the village of Maysville, Mo., where he resided and kept his office, which piece of property is hereafter referred to as the "Residence Property." He had at the time three horses and two vehicles, about $1,000 in money, and some outstanding accounts. During the spring, summer, and autumn of the year 1882, several parcels of land, amounting to 280 acres, were purchased, which land is hereafter spoken of as the "Watts Farm," and in 1886 was worth about five or six thousand dollars. The title to the land thus purchased was taken in the name of the uncle. In March, 1885, four lots of land were purchased in the village of Maysville, Mo., for $2,500, the title to which was also taken in the name of the uncle. The latter property is hereafter referred to as the "Meyer Lots." The title to these three pieces of property remained in Dr. Malcolm McKinnon at the time of his death. After his death, the appellees, who are a brother and sister of the deceased, brought an action of ejectment against the appellant to recover the three parcels of real estate in question, whereupon the appellant filed the present bill, to enjoin the prosecution of the ejectment suit, and to specifically enforce his right of survivorship, claiming that said property was "held in partnership" when his uncle died, and that he became entitled to it under the partnership articles. The circuit court, on final hearing, dismissed the bill. The opinion of the circuit court is reported in 46 Fed. Rep. 713.

Stephen S. Brown, for appellant.

Willard P. Hall and Vinton Pike, for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

THAYER, District Judge, (after stating the case.) The action of the circuit court in dismissing the bill was made to turn largely, if not entirely, on the following findings of law and fact:

First. That the clause in the partnership articles of date January 1, 1884, which provided that, in the event of the death of the senior member, "all his property, personal and otherwise, which he held in partnership at the time of his death, should go to the junior partner," was a mere testamentary disposition, and void, because not executed in conformity with the Missouri statute concerning wills.

Second. That the clause in the partnership articles last referred to was in any event a mere gratuity, which rested upon no consideration, and for that reason would not be enforced in equity. And

Third. That while the evidence showed that a part of the realty described in the bill was acquired during the existence of the partnership, and was paid for in part with partnership funds, yet that the evidence failed to show that any of said real estate was "held in partnership" at the time of Malcolm McKinnon's death.

It will be convenient to consider these several propositions in the order last stated. There are many cases to be found in the books, some of which have been called to our attention, and are evidently relied upon in the present case, where an instrument which was intended by the grantor to be a conveyance was held not to be operative as such, because it did not pass any present interest, and to be void as a will, because not executed in conformity with the

statute of wills. Hester's Ex'r v. Young, 2 Ga. 31; Turner v. Scott, 51 Pa. St. 126; Roth v. Michalis, 125 Ill. 325, 17 N. E. Rep. 809; University v. Barrett, 22 Iowa, 73. The distinction between a deed and a will is elementary, and is well understood. The former must pass a present interest, although the right to possession and enjoyment may not accrue until some future time; whereas an instrument which does not pass any interest until after the death of the maker is essentially a will, and must be executed with all due formalities. But we fail to see that these authorities, or the principles which they enunciate, have any proper application to the case at bar. The partnership articles involved in the present controversy were neither intended as a deed or a will. They constitute an executory agreement, which determines the rights of the parties inter se, and provides what disposition shall be made of the partnership property on the happening of a certain event. In the state of Missouri, where these articles were signed, and where both partners at the time resided and carried on business, it is as well settled, as it is in any state of this Union, that an agreement by a person, upon a valuable consideration, to give to another the whole or a part of his property at the promissor's death, will be specifically enforced in equity, both as to real and personal property, if the consideration is duly rendered by the promisee. Wright v. Tinsley, 30 Mo. 389; Sutton v. Hayden, 62 Mo. 101; Gupton v. Gupton, 47 Mo. 47; Hiatt v. Williams, 72 Mo. 214; Sharkey v. McDermott, 91 Mo. 647, 4 S. W. Rep. 107; West v. Bundy, 78 Mo. 407. And the same doctrine was approved by this court, in view of these authorities and others of a similar character, in Jaffee v. Jacobson, 4 U. S. App. 4, 1 C. C. A. 11, 48 Fed. Rep. 21. We can conceive of no sufficient reason why an agreement contained in partnership articles, to the effect that, in a certain contingency, one of the partners shall succeed to all of the partnership assets, should not be held valid, and should not be specifically enforced in equity when the contingency happens, if an agreement such as we have last referred to is held to be valid and enforceable, as it certainly is in the state where this controversy had its origin. Under such an arrangement between partners the one in whom the right of survivorship is thus vested, would hold all of the partnership assets, subject to the payment of the partnership debts, as he would in any event; and we are not aware of any considerations which should preclude the making or the enforcement of such an agreement. We think, therefore, that the first proposition above stated, on which the decision of the case was made to turn, was erroneously decided.

We are also of the opinion that the second proposition above stated is not tenable; that is to say, we think that it cannot be maintained that the agreement that the junior partner should succeed to all of the partnership property on the death of the senior member was a mere gratuitous promise, which rested upon no consideration, and for that reason was not enforceable. No extended argument is necessary to show that this provision of the partnership agreement rests upon the same meritorious consideration that

supports the other provisions of the partnership articles. The consideration which supports the agreement as a whole, consists of the mutual promises of the parties to become partners, and to conduct the partnership business on the terms mentioned in the partnership agreement. It is not denied that this promise on the part of the junior partner was faithfully performed until the death of the senior member of the firm, and, that being conceded, we are unable to understand how it can be successfully asserted that the provision that he should be entitled to the senior member's interest in the partnership assets did not rest upon a valuable consideration.

This brings us to the third and most important contention of counsel for the appellees, that none of the lands in controversy were in fact "held in partnership" at the time of Dr. Malcolm McKinnon's death; and, if that proposition is maintainable, the bill was properly dismissed. It was conceded by the circuit court that the lands purchased during the existence of the partnership—that is to say, the Watts farm and the Meyer lots—were paid for in part with the moneys of the firm. After a careful perusal of the testimony, we have reached the conclusion that all of the payments made for the last-mentioned property were made with partnership funds, with the single exception of the first payment made on the Watts farm, in the sum of $1,200, which payment appears to have been made with money which belonged to the senior member of the firm. But, although it is true that the lands purchased during the existence of the partnership were purchased with partnership funds, yet it does not follow, necessarily, that the lands so acquired became partnership property, or were held in partnership when the senior Dr. McKinnon died. When, during the existence of a copartnership, real estate is purchased with partnership funds, and the title thereto is taken in the name of one member of the firm, the real estate so acquired does not become a part of the firm assets, unless such was the intention of the partners. Tillinghast v. Champlin, 4 R. I. 173; Ludlow v. Cooper, 4 Ohio St. 1; Collumb v. Read, 24 N. Y. 505; Buchan v. Sumner, 2 Barb. Ch. 165; Page v. Thomas, (Ohio Sup.) 1 N. E. Rep. 79. It may have been that the purchase was merely an investment of surplus funds, and that it was the intention of the parties to hold the lands as tenants in common, rather than as partnership property. The fact that lands have been purchased during the existence of a firm with partnership money, and that the title has been taken in the name of one of the partners, is but a single persuasive circumstance tending to show that they are partnership assets. It is necessary to further inquire, when the intent of the parties is not manifest, whether the real estate so acquired was used for partnership purposes, or whether the income derived therefrom, and the expenses incident thereto, were carried into the partnership accounts, and treated as partnership matters. It is generally held that these latter considerations are controlling circumstances in determining whether lands purchased with the money of a firm, and held in the name of one partner, are in fact partnership assets. Fairchild

v. Fairchild, 64 N. Y. 471, 481; Whaling Co. v. Borden, 10 Cush. 458, 475; Collins v. Decker, 70 Me. 23; Collumb v. Read, 24 N. Y. 505; York v. Clemens, 41 Iowa, 95; Sherwood v. Railway Co., 21 Minn. 128, 130. Pursuing this line of inquiry, then, with reference to the use made of those lands which were purchased during the existence of the copartnership, we find the fact to be that the Meyer lots were occupied and used as an office by the firm, from the time they were purchased until the death of Dr. Malcolm McKinnon. It may be conceded that, strictly speaking, the Watts farm was not used for the purpose of transacting the business mentioned in the partnership articles, but it does appear that the firm frequently took live stock in payment for fees, and that the animals so taken were used to stock the farm, and that, at the time of Dr. McKinnon's death, the firm had acquired and then owned a large herd of live stock, which was being grazed and fed on the farm in question. It furthermore appears that all of the expenses incident to the care and management of the farm were paid out of the partnership funds; that whatever income was derived therefrom was received by the firm; and that no charge was made against the firm by the senior partner, in whose name the title was taken, for the care and support of the live stock of the firm which were herded on the Watts farm.

Thus far we have only referred to a class of facts which are generally held sufficient in themselves, when the matter is in doubt, to show that real estate which was purchased by a partner with partnership funds is in fact partnership property. But the case does not rest on such proof alone. The appellant testified, in substance, and his testimony was received without objection as to its competency, that all of the real property that was acquired during the existence of the partnership was purchased after a conference between himself and his uncle, upon a distinct understanding that it should form a part of the partnership assets; that it was always treated by them as partnership property; and that both had equal authority in controlling the same. There was also abundant evidence of admissions made by Dr. Malcolm McKinnon during his lifetime, to disinterested third parties, that the lands in controversy were the property of himself and his nephew, and that both had an equal voice in their management. It is also worthy of notice that the clause in the partnership articles which the appellant seeks to enforce contains an implied admission that the property of the firm did not consist entirely of personalty. It was provided in the articles that the right of survivorship should extend to all of the senior member's property "held in partnership, personal *and otherwise.*"

In view of all of the foregoing considerations, we have reached the conclusion that it is sufficiently established by the record that the Watts farm and the Meyer lots were held in partnership, and were in fact partnership assets when the senior member of the firm died, and that the circuit court should have so decreed.

The evidence that was offered to establish the fact that the residence property was also partnership assets at the time of Dr.

McKinnon's death is of the same character as that which we have already alluded to in treating of the real estate acquired during the existence of the firm; that is to say, the evidence shows that the residence property was used as an office by the firm from the time it was formed, about the 1st of January, 1882, until the Meyer lots were purchased, in the spring of 1885. In the mean time no rent was paid by or demanded of the firm for the use of the premises in question. During the same period some permanent improvements were made on the property, at the expense of the firm, and a considerable sum was thus expended, considering the small value of that property. After the firm ceased to use it as an office, it was rented to third parties, and the rents received were credited to the firm, and treated as partnership funds. These facts are practically undisputed. The junior partner also testified that it was expressly agreed between himself and his uncle, when the partnership was originally formed, that the residence property should become a part of the partnership assets, and that it was always so treated both by himself and his uncle. This was one of the considerations which induced the nephew to enter into the partnership. These statements of the nephew are strongly corroborated, in our opinion, by proof of similar statements made by the elder Dr. McKinnon during his lifetime to disinterested witnesses. It was further shown, and the fact is undenied, that from January, 1882, to May, 1886, no individual account was kept of moneys received or expended by either member of the firm. On the contrary, during the entire period, all of the property in their possession was treated as common property, and all moneys received were deposited in bank to the credit of one account, which was drawn upon at will, both by the uncle and the nephew. Furthermore, it is apparent to us that the firm accumulated property much more rapidly than the senior member appears to have done before the firm was organized. In view of all the facts and circumstances, we can hardly doubt that both members of the firm regarded the residence property as a part of the firm assets, notwithstanding the fact that it was not purchased with partnership funds; and we think that it should be so treated in order to give effect to the intention of the parties, unless there are insuperable legal obstacles which preclude us from so doing. The circuit court appears to have entertained the view that no relief could be afforded as to the residence property, by reason of the statute of frauds. At all events, a doubt was intimated whether a verbal agreement to put lands into a firm, made before a firm exists, is effectual to pass either a legal or equitable title to the same, even though the parties have acted for years on the faith of the agreement, and in the mean time have treated the lands as partnership property and made large expenditures thereon. With respect to this suggestion, it is only necessary to say that no objections were made on the trial to any of the testimony on the ground that it was incompetent under the statute of frauds. Furthermore, we know of no reason why a parol agreement, of the kind last indicated, may not be specifically enforced when there has been such a

part execution of the same as will ordinarily suffice to take a parol contract for the sale of lands out of the operation of the statute of frauds, and instances are not wanting where contracts of the latter character have been specifically enforced in the courts of the state from which this appeal comes.    Tatum v. Brooker, 51 Mo. 148; Dozier v. Matson, 94 Mo. 328, 332, 7 S. W. Rep. 268; Self v. Cordell, 45 Mo. 345, 346.   But, however this may be, we think it is well established by the weight of authority that when the existence of a firm is established, by an instrument of writing, any one who is concerned in the firm assets (whether he is a creditor of the firm or a partner) is then at liberty to prove by extrinsic evidence, or by parol, that certain lands which are held by one of the partners are in fact the property of the firm.   Cases of this description are not within the provisions of the statute of frauds.   Whaling Co. v. Borden, 10 Cush. 458, 475; Collins v. Decker, 70 Me. 23; Dale v. Hamilton, 5 Hare, 369; York v. Clemens, 41 Iowa, 95, 102; McGuire v. Ramsey, 9 Ark. 518; Jarvis v. Brooks, 27 N. H. 37, 67; Sherwood v. Railway Co., 21 Minn. 128.

In view of what has been said, our conclusion is that the circuit court erred in dismissing the bill.   Its decree is therefore reversed, and the case is remanded to the circuit court, with directions to vacate its former decree, and to enter a decree in favor of the complainant, vesting him with all the right, title, and interest in and to the lands in controversy that was held or owned by Dr. Malcolm McKinnon at the time of his death, and further perpetually enjoining the appellees from further prosecuting any ejectment suit to recover said lands, under any pretended right or title thereto, acquired by the laws of descent, from **Dr. Malcolm McKinnon.**