214 P.2d 518

CRONE et ux. v. AMADO.

No. 5073.

Supreme Court of Arizona.

Feb. 7, 1950.

Richard H. Chambers, of Tucson, attorney for appellants.

Martin S. Rogers, of Tucson, attorney for appellee.

LA PRADE, Chief Justice.

This is an appeal from a money judgment for labor and materials and fixing a lien. In August, 1946, appellants Mr. and Mrs. Crone (defendants below), owners of the El Rancho Corono Guest Ranch, located approximately 12 miles from Tucson, made arrangements with Voight Realty Company to procure a person who would loan $25,000 on the property to be used to take up two mortgages totaling $8,700, the balance to be left with the realtor and expended through him toward a proposed addition to their then existing main building. Prior to these loan arrangements, appellants had engaged an architect to draw plans and specifications and supervise the construction. The architect had recommended a building contractor, Hector C. Amado, appellee (plaintiff). On August 28th, the Crones and Amado met in the realtor's office and signed a "Memorandum of Agreement" prepared by the realtor, and two days later this agreement was signed by the mortgagee referred to therein. The agreement was entitled:

"*Memorandum of Agreement*

"Specifications and

Payment Plan"

Then followed a description of the property, specifications indicating generally the character of the new structure, referring to overall dimensions, number of rooms, room sizes, construction material, etc.,

and, quoting from the contract, it was provided that

"Mortgagee, through his agents, the Voight Realty Company, 603 East 6th Street, Tucson, Arizona, agrees to furnish the total sum of $25,000.00 to mortgagors and contractor as follows:

"$8700.00 upon the execution and delivery of said realty mortgage, out of which sum the existing first and second mortgages shall be paid in full and out of which sum all expenses in connection with the placing of said mortgage shall be paid;

"The remaining balance of said $25,-000.00 shall be paid to the contractor, with the approval of Frederick Eastman, supervising architect, the approval of mortgagors and the approval of the mortgagee and his agents, Voight Realty Company, as follows:

"Monies are to be paid to materialmen and laborers as bills are submitted by the contractor, not oftener than once each week to Voight Realty Company. Ten per centum (10%) over and above each weekly or other bill for material and labor shall be paid direct to the contractor.

"Except that the sum of $1650.00 shall be withheld by the mortgagee through his agents, Voight Realty Company, until the said building is completed and ready for occupancy.

"All specifications not specifically mentioned herein shall be covered by formal

392

specifications to be drawn by Frederick Eastman, supervising architect, and nothing herein shall be interpreted so as to interfere with said architect's specifications. Plans and specifications now extant and to be made by Frederick Eastman shall be and are hereby made a part of this agreement, which agreement shall be binding upon the heirs, executors, administrators and assigns of all parties hereto."

Plaintiff began the construction of the building on September 3, 1946, and worked until December 14th, at which time it was estimated that the building was about two thirds finished, and that it would probably take $7,000 to complete it. On this date all funds in the hands of the realtor, who had been paying Amado's claims weekly, were exhausted, and Amado left the job and presented his statement for moneys due on the contract for materials and labor. Later defendants asserted that the contract was a fixed-price contract, and that plaintiff was obligated to build the building for $16,300 (being the sum available from the $25,000 loan after paying off existing mortgages in the sum of $8,700). Amado's position was that it was a cost-plus contract and had been so treated by the parties from the beginning.

Plaintiff's evidence was to the effect that at the time the Memorandum of Agreement was signed no plans or specifications had been exhibited to him, though the contract recited that the work was to be done "in accordance with plans and specifica-tions *now existing* and to be drawn * * *" (Emp.sup.); and that he had been engaged in the work two days before any plans were produced.

There was introduced in evidence a pamphlet containing 22 large pages of single-spaced, typed specifications which plaintiff testified first came into his possession two and one half months after construction began. Shortly after the job was commenced plaintiff received a blueprint of the floor plan, and later during the construction received a second blueprint of the floor plan. It was then discovered that the ground to be covered by the bedroom wing was more than nine feet higher than the opposite corner and the work had to be accomplished by making a nine-foot excavation. The terrain was so uneven that in some places the foundations were eight feet in height above the ground; the finished floors were on three levels; and it was necessary to build a concrete tunnel under the building to care for flood waters.

That the parties were proceeding on a cost-plus basis was demonstrated by evidence that defendants during the progress of the building constructed a ramada close to the new addition, and in this construction used sand, cement, and materials that plaintiff had secured for the contract construction; that at the insistence of Mr. Crone defendant hired a carpenter not desired by him; that on December 6th when defendant presented his weekly statement

there were insufficient funds to pay his bill; that he threatened to quit but at the request of the realtor who said that he was working on a new loan, he continued to work; that the next week there were still no funds, which precipitated his leaving the job; that before leaving the job Mr. Crone telephoned him and informed him that he was trying to refinance and requested him to stay on; that he met with all the interested parties at which time it was agreed that it would take approximately $7500 to complete the job, and that there was then due plaintiff some $2600.

All of plaintiff's weekly claims for laborers on the job, materials, mileage, and hauling were submitted on separate memorandums, checked by the architect, and then typed by the architect's secretary into formal statements which were approved by the architect and presented to the realty company for payment.

The architect testified that at the time the Memorandum of Agreement was signed there was in existence a revised preliminary plan, not drawn to scale, and referring to it said, "They are simply a basis of study, a basis of discussions for the working drawings to be prepared"; that the working drawings were prepared after the work was commenced, and were changed from day to day as work progressed; that he approved Amado's weekly accounts, including "his ten percent cost plus," upon the express instructions of Mr. Crone;

that Crone at no time told him that he was proceeding on a fixed-price contract; and

"A. There was never at any time any agreement as to what the total cost of the building would be.

"Q. Did he tell you that he had $25,000.00 available for the building?

"A. He hold me he had $25,000.00 with which to incur the cost of the building, *plus the furnishings of the building, plus the interior furnishings.*" (Emphasis supplied);

that during the progress of the building he had discussions with Mr. Crone with reference to the high cost of materials, and that it was agreed between them to reduce room sizes, etc., which he did; that he often discussed with Mr. Crone the difficulty of obtaining building materials, the O.P.A. price regulations, etc.

"I told him under the fluctuating prices of O.P.A. that no estimate could be made other than a very approximate estimate of any cost because prices were rising suddenly; that a building would cost what the selling price was on the market at that time, and no overall cost of the building could be given under any circumstances. Not only did I say that in August, but I advised him not to build frequently during construction."

Plaintiff testified that at the time the memorandum was executed Mr. Crone questioned his right to wages for himself plus a ten percent supervision fee but

after counseling with the realtor agreed to it. Soon after the construction began Mr. Crone insisted that the charges for hauling were excessive. With reference to this situation the architect testified that Mr. Crone asked him in the presence of Mr. Amado if he considered the transportation costs excessive; that Mr. Amado said if Mr. Crone was not satisfied with his cost of hauling he could hire somebody else to do it; that Mr. Crone made no response and did not direct him to thereafter disapprove the hauling and mileage charges, and that he continued to approve them.

Plaintiff's complaint was on the theory that the contract was oral except as to plans and specifications and his fee, and that the plans and specifications were thereafter orally modified from time to time as necessity arose and the work progressed.

Defendants by answer set up the defense that the Memorandum of Agreement was the building contract; that it should be interpreted as a fixed-price contract from within its four corners; that they had paid the contractor more than he was entitled to; and cross complained for damages for failure to complete the contract. Alternatively, defendants asserted that if the court should find a contract for cost, plus a percentage to the contractor for supervision, plaintiff could not legally incorporate in his account items for hauling and mileage over the public highways for the reason that he admittedly had no certificate of convenience and necessity as a private or public carrier; and that plaintiff was not entitled to charge supervision of 10% on the wages he drew for himself as a carpenter.

By written findings of fact the court found: (1) that parties had entered into an oral contract for the construction of the building; that defendants had agreed to pay plaintiff all of his labor and material costs, mileage on his automobile and trucks, and a 10% supervision fee; (2) that part of said contract covering specifications and payment plan was reduced to a written Memorandum of Agreement signed by the owner, the contractor, and the mortgagee; (3) that the Memorandum of Agreement did not cover all the terms of the contract, and that the same was from time to time amended and added to by mutual agreement; (4) that plaintiff had fully performed, and that defendants were indebted to him in the sum of $1,-896.27; (5) that the parties did not adhere to the Memorandum of Agreement in that among other things the materials were arranged for by plaintiff who purchased them in his own name, and that laborers were hired by him; that plaintiff submitted his weekly statement for labor, supervision, mileage and hauling, wages for himself and bills of materialmen; that all moneys was paid directly to the contractor in accordance with the weekly statements which were approved by the

architect prior to presentation for payment; that defendants accepted the weekly statements and the manner of payment, even though this was not as specified by the said Memorandum of Agreement; (6) that plaintiff provided his own trucks for hauling materials and transportation of labor.

It was also included in the findings of fact rather than in the conclusions of law that plaintiff was entitled to add to his own personal wages 10%, and (7) that plaintiff was not legally required to have had a certificate of convenience and necessity from the Corporation Commission as a contract hauler, and was entitled to recover for the value of the transportation services and 10% in addition thereto.

By sufficient assignments of error and propositions of law defendants assert error in the findings of fact and judgment (A) that the parties entered into a cost-plus contract; (B) that the Memorandum of Agreement did not cover all the terms of the building contract and in admitting parol testimony to modify its terms; (C) in denying defendants' counterclaim; (D) in rendering any judgment for plaintiff: and alternatively if a theory of cost plus was accepted that the court erred (a) in its judgment allowing plaintiff to charge a supervision fee of 10% on his personal wages, and (b) in concluding that plaintiff was not required to have a certificate of convenience and necessity as a contract carrier before a charge for mileage and hauling on the public highways could be allowed.

At the beginning of the trial plaintiff attempted to prove an oral contract, and was met with an objection that an attempt was being made to evade the written contract by parol evidence. At first the trial court sustained defendants' objections and endeavored to limit plaintiff to the written memorandum and subsequent events and conversations which could be construed as oral modifications of the writing. As the trial progressed the court apparently became aware that the written memorandum was so sketchy that, if it were to be determined what the relationship between the parties was and had been, extrinsic evidence if available would be enlightening. At this stage of the proceeding the court admitted some parol testimony leading up to the making of the written memorandum. In adopting this position the court in part relied on a statement in the memorandum which recited that one of the considerations for the loaning of the money by the mortgagee, who was a party to the writing, was the existence "of a certain building contract" between the "mortgagors" and the contractor. This reference could only have been to an oral contract.

Plaintiff's contention that the oral contract provided for the construction on a cost-plus basis is fortified by the provisions of the writing which seem to indicate that labor and material costs were to be paid through the relator, while

payments to the contractor were to be "direct" and in the sum of "ten percentum (10%) over and above each weekly or other bill for material and labor * * *." Presumably this ten percent was to be paid weekly though the memorandum is silent in this regard.

■ The written memorandum is also silent as to when the work provided for therein was to commence or be concluded. No fixed price was specifically mentioned. It is only by implication that the alleged fixed price was to be in the sum of $16,-300, though the writing did provide that "the remaining balance of said $25,000 shall be paid to the contractor" * * * "except that the sum of $1650 shall be withheld by the mortgagee through its agent Voight Realty Company until said building is completed and ready for occupancy." In view of all these uncertainties can it be conclusively presumed that the written memorandum represented the whole engagement of the parties so as to preclude evidence establishing a precedent parol agreement? In Stewart v. Southwest Cotton Co., 38 Ariz. 547, 2 P.2d 1041, 1043, quoting with approval from Wagner v. Marcus, 288 Pa. 579, 136 A. 847, this approach is suggested:

"The test, to determine whether an alleged parole agreement, by which it is proposed to modify the expressed understanding, comes within the field embraced by the writing, is to compare the two and determine whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other, if it were made."

■ Appellants insist that the rule relating to parol evidence that is applicable and should have been followed by the trial court is that statement of the rule set forth in S. H. Kress & Co. v. Evans, 21 Ariz. 442, 189 P. 625, 626, reading as follows:

"The law is very firmly settled that when parties have put their engagements into writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of the undertaking was reduced to writing, and all oral testimony of a previous colloquim between the parties, or of conversations or declarations at the time it is completed, or afterwards, is rejected."

Counsel for plaintiff does not question this rule but claims that it does not apply to the contract sued on for the reason that he is relying on an oral contract as supplemented by the written memorandum relating to the plans and specifications and mode of payment. In this theory the trial court concurred and we think correctly so. It is quite evident that the written memorandum did not deal with the entire subject matter of the contract between the parties. In this situation parol evidence as to the oral agreement con-

cerning matters not included in the writing was admissible. Stewart v. Southwest Cotton Co., supra.

Where the written language of an agreement is susceptible of more than one meaning the surrounding circumstances at the time it was made should be considered for the purpose of ascertaining its meaning. Branker v. Bowman, 62 Ariz. 214, 218, 156 P.2d 898; Coe v. Winchester, 43 Ariz. 500, 505, 33 P.2d 286; 12 Am. Jur., Contracts, sections 247-248. We are satisfied that our analysis of the writing conclusively demonstrates that the words used do not convey a plain explanation of the mutual obligations attempted to be defined. Some of the surrounding circumstances were that neither of the parties had seen any plans or specifications; no survey had been made of the proposed building site; building materials were scarce and what were available were rationed under O.P.A. regulations. It does not seem plausible that any contractor in this situation would agree to build a building for a fixed price. A contract must be deemed to have been made with reference to the state of things existing at the time it was made. Chesapeake & O. Canal Co., v. Hill, 15 Wall. 94, 21 L.Ed. 64.

If we assume that the written memorandum constitutes the entire agreement between the parties it is so pregnant with patent and latent ambiguities that it became the duty of the trial court to construe it, and "where a contract is ambiguous or equivocal * * * extrinsic evidence may be resorted to for the purpose of determining the real meaning of the contract." Valentine v. Shepherd, 19 Ariz. 241, 244, 168 P. 643, 644, and Miller Cattle Co. v. Francis, 35 Ariz. 535, 281 P. 211. When ambiguities are present in a contract, its interpretation by the parties is most helpful, and practically all courts give heed to such practical interpretations. This court has long been committed to this rule. In Powers v. World's Fair Mining Co., 10 Ariz. 5, 8, 86 P. 15, 17, this court, on rehearing, said:

" * * * In determining the construction placed upon an ambiguous contract, the construction placed upon it by the parties, whether evidenced by some acts or circumstances contemporaneous with the execution of the contract, or by subsequent acts or circumstances, or formal expression, is entitled to consideration in resolving the ambiguity. * * *"

In Rio Grande Oil Co. v. Upton Oil Co., 33 Ariz. 474, 266 P. 3, it was held that when the terms of a contract are in doubt practical construction by the parties may be considered; and in Pendleton v. Brown, 25 Ariz. 604, 625, 221 P. 213, it was held that the court will adopt a construction given to a contract by the parties themselves unless such construction does violence to the express terms of the writing, especially where such interpretation has extended over a long period of time. The evidence here discloses that

398

the parties from the outset interpreted the building agreement as a cost-plus job. There was no intimation that it was not a cost-plus job until the defendants ran out of funds. The trial court was warranted in concluding that it was a cost-plus contract, and the parties by their conduct are bound by such a construction.

Having concluded that the trial court did not err in determining that the building was to be constructed on a cost-plus basis, we will now address ourselves to defendant's assignments (I) that plaintiff was not entitled to a supervision fee of 10% on his personal wages, and (II) that plaintiff was not entitled to pay for the use of his automobile and trucks, not having a certificate of convenience and necessity as a contract carrier. What we have heretofore said with reference to the interpretation of the contract made and adhered to by the parties is applicable and controlling with reference to the supervision fee. There is no merit in defendants' claim that plaintiff is not entitled to be reimbursed for use of his automobile and trucks because he was not a certificated contract carrier. There is ample evidence in the record to sustain the court's findings and conclusion that the parties did not adhere to the Memorandum of Agreement which seemed to indicate that materialmen and laborers were to be paid directly by the realty company, and it was inferable from the writing that materials were to be purchased in the name of the builder; nevertheless the plaintiff arranged for and purchased the materials in his own name. Had these materials been lost or destroyed in transit to the job the loss would have fallen upon the plaintiff. Therefore, plaintiff was hauling his own materials and in such case was not acting as a contract carrier hauling the goods of another on the public highways for compensation.

As a consequence of our disposition of the assignments treated above, defendants' assignment of error complaining of the court's failure to give them a judgment on their counterclaim predicated on plaintiff's failure to complete the building falls.

The judgment is affirmed.

UDALL, STANFORD, PHELPS, and DE CONCINI, JJ., concur.